IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                        CASE NO. 11- 07920 (ESL)

PONCE DE LEON 1403, INC.                      CHAPTER 11

    Debtor

OPINION AND ORDER

This case is before the court upon Ponce de León, 1403, Inc.'s (hereinafter referred to as "Debtor" or "Ponce de León") *Motion Requesting Valuation Hearing under 11 U.S.C. §506 and Fed. R. Bankr. P. 3012 in Order to Proceed under Section 1129(b)(2)(A)(iii) as to PRLP* (hereinafter referred to as the "motion requesting valuation").  The Debtor states in its motion requesting valuation that it will proceed with the confirmation of its Plan of Reorganization under Scenario B of the Plan of Reorganization[1] pursuant to the provisions of section

---

[1] The two (2) scenarios proposed by Debtor in its *Amended Plan of Reorganization Dated January 25, 2013* (Docket No. 177) are the following:

"**Scenario A**: Debtor will retain the property and PRLP will retain the liens securing its claim(s). On account of such claim PRLP will receive deferred cash payments totaling the full amount of its claim, of a value as of the effective date of the plan estimated in $10.1 million approx. (See payment schedule for payments of principal and interest), within 36 months. The Debtor will continue the sale of the unsold units for a term of thirty six (36) months with a mutually satisfactory budget for the use of the cash collateral and a strong and well-planned marketing strategy and lease program to be agreed with the secured creditor, before the confirmation hearing. The Debtor will provide to PRLP prior to confirmation the proposed budget and marketing plan, for its approval. The budget will include the cost inherent to the sale of the units and the operating expenses including the cost of a marketing plan to be approved jointly. Upon full payment to PRLP, which is expected within the first 36 months of the plan, it will release the Parties of any and all obligations in connection with the claim filed in the United States Bankruptcy Court, case no.: 11-07920 (ESL). All other litigation between the parties, including but not limited to the litigation in the bankruptcy case and appeal no.: 12-01577 (JAF) filed before the United States District Court will be voluntarily dismissed. Pending litigation against shareholders in state court San Juan Ward, in case no.: KCD 2012-30551, will be dismissed 'without prejudice,' upon confirmation of the plan.

**Scenario B**: In the event the Debtor cannot reach an agreement with the secured creditor under Scenario A, for the sale of the units and the full payment of its secured claim within 36 months, then the Debtor will surrender to PRLP property of the estate equal in value or equivalent to the value of PRLP's secured claim as of the confirmation date. This property will be the remaining residential units at Metro Plaza Towers Condominium project, the commercial spaces and parking spaces. Pursuant to the appraisal report dated December 4, 2012, which includes a '20% discount rate,' the total amount of the units to be surrendered are the indubitable equivalent and sufficient to cover the entire debt of PRLP as of this date, considering that the property is fully develop[ed] and ready for sale and that any risk due to marketing is adequately included in the general 'discount rate' considered by the appraiser, in a deduction of

-1-

1129(b)(2)(A)(iii) of the Bankruptcy Code, surrendering "all the property" that constitutes the collateral of PRLP 2011 Holdings LLC (hereinafter referred to as "PRLP"). Thus, the Debtor alleges that by surrendering the collateral the secured creditor will receive the indubitable equivalent of its secured claim.

The Debtor requested a valuation hearing to determine the value of the collateral (Docket No. 314). PRLP in its *Supplement to Objection to Confirmation of Amended Plan of Reorganization (Docket No. 177)* objected to debtor's Amended Plan of Reorganization for various reasons. However, the reasons which are in controversy and are directly affected by the valuation of the collateral are the following: (i) Scenario B fails to provide for the payment of PRLP's unsecured deficiency claim because Debtor will not be able to pay the entirety of PRLP's allowed claim, even with the turnover of the project; (ii) the plan is not confirmable because it fails to comply with the indubitable requirements of 11 U.S.C. §1129(b)(2)(A)(iii); and (iii) the surrender of the collateral does not satisfy PRLP's allowed claim, due to the $2,000,000 unsecured deficiency (Docket No. 327). The Debtor filed its *Response to PRLP's Objections to Confirmation of Amended Plan Dated January 25, 2013, as Supplemented (Dkts. 177, 181, 194, 315, 327, 336)* (Docket No. 352) (valuation hearing and hearing for confirmation scheduled for the same date).

Subsequent to the confirmation hearing, the Debtor filed a *Memorandum of Law as to the Valuation Method to be Used under 11 U.S.C. 506 and 11 U.S.C. §1129(b)(2)(A)(iii) when the Complete Collateral is to be Surrendered as the Indubitable Equivalent and Applicable Appraisal Standards and Guidelines* arguing that the appropriate methodology that should be employed is the aggregate of the "fair market value" of the individual units of the collateral to which some administrative expenses need to be discounted from the value and not the "value to a single purchaser" or "bulk value" methodology in which certain expenses and profit are deducted

---

20% of the real value. See December 4, 2012 appraisal included as Exhibit 2. Upon full payment to PRLP for the realization of the equivalent of its secure[d] claim, the Debtor will be release[d] from such debt and claim in full. Under both scenarios, this class is impaired." (Docket No. 177).

to reduce the fair market value considerably (Docket No. 361). PRLP also filed its *Brief on Valuation for Hearing on Confirmation of Amended Plan* arguing that the appropriate methodology that should be employed is the bulk sale value which is also known as the market value to a single purchaser which is a conservative approach to valuation of collateral that is consistent due to the risks being shifted to PRLP by Debtor's proposed surrendering of the collateral (Docket No. 362).

The confirmation hearings were held on April 8 and 24, 2014 in which expert testimony from three (3) appraisers was heard by the court (Docket Nos. 366 & 379). On May 19, 2014, the Debtor filed its *Proposed Findings of Facts and Memorandum of Law in Support of Confirmation of Debtor's Plan of Reorganization and Valuation of Collateral* (Docket No. 404). On the same date, PRLP also filed its *Proposed Findings of Facts and Conclusions of Law in Hearing on Confirmation* (Docket No. 405). For the reasons stated herein, the court concludes that the appropriate appraisal methodology that should be employed in this particular case is the market value to a single purchaser which was used by both Mr. Vallejo and Mr. Bonnin. This court finds that Mr. Vallejo's appraisal report is the most accurate as to the valuation of the two (2) commercial locales and that Mr. Bonnin's appraisal report is the most accurate as to the valuation of the residential units under the circumstances. This court concludes that the Debtor's proposed surrendering of the complete collateral is not the "indubitable equivalent" of PRLP's (entire) claim pursuant to §1129(b)(2)(A)(iii) and thus, there is an unsecured deficiency claim on behalf of PRLP.

The main issue before the court is the confirmation of the Chapter 11 plan. The same hinges on the valuation of Debtor's assets and the timing of the valuation as these two factors will determine the extent of secured creditor PRLP's claim. The valuation will, in turn, determine compliance with 11 U.S.C. §1129(b)(2). The case has substantially centered on the litigation between the Debtor and PRLP regarding the payment of the latter's claim. The litigation is an example of the competing interest of the Debtor to retain collateral and those of

the secured creditor to preserve its rights over the collateral and be paid its claim. The continuous litigation for use of cash collateral must now be subject to the finality of confirmation.

## Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(B) and (L). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

## Procedural Background

Ponce De León 1403, Inc. filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on September 16, 2011. The Debtor included Banco Popular de Puerto Rico (predecessor secured creditor) in its Schedule D- Creditors Holding Secured Claims- as a secured creditor of a commercial loan incurred in the year 2005 that is secured with the Metro Plaza Towers condominium apartments, which consists of 47 residential apartments, a commercial area and parking spaces which have a value of $24,189,800. The Debtor disclosed that the amount of the claim, without deducting the value of the collateral, was in the amount of $14,723,989 (Docket No. 14). On October 5, 2011, a *Notice of Transfer of Claim* was filed by PRLP requesting the court to take notice that the claims of Banco Popular de Puerto Rico against the Debtor have been duly transferred to PRLP pursuant to Fed. R. Bankr. P. 3001(e)(2) (Docket No. 23). On October 27, 2011, the Debtor and PRLP filed a *Stipulation on the Use of Cash Collateral and Adequate Protection* (Docket No. 38).

On January 5, 2012, the Debtor filed a *Motion Requesting an Extension of the Exclusivity Period to Submit a Disclosure Statement and Secure the Votes to Confirm a Plan of Reorganization under 11 U.S.C. §1121(d)(1) and Request for a Reduction in the Period to Respond to Ten (10) Days* (Docket No. 54) and the same was granted on January 11, 2012 (Docket No. 55). On January 20, 2012, PRLP filed proof of claim No. 7-1 in which it disclosed that the amount of the claim as of the filing of the bankruptcy petition was $14,496,907.24 and that the amount of the secured claim was also in the amount of $14,496,907.24. On March 12,

2012, the Debtor filed a *Second Motion Requesting an Extension of the Exclusivity Period to Submit a Disclosure Statement and Secure the Votes to Confirm a Plan of Reorganization under 11 U.S.C. §1121(d)(1) and Request for a Reduction in the Period to Respond to Ten Days* (Docket No. 65).

On February 15, 2012, the Debtor filed a *Second Motion to Use Cash Collateral and Adequate Protection* in which both the Debtor and PRLP filed a joint stipulation in which PRLP consented to the Debtor's limited use of certain of its cash collateral to satisfy certain operating expenses (Docket No. 60). On March 13, 2012, a hearing was held in which the Court ordered as follows: "(1) [t]here being no opposition, the request for use of cash collateral and adequate protection (docket #60) is hereby granted. (2) [The] motion to extend exclusivity period (docket #65) is hereby granted" (Docket No. 66).

On April 13, 2012, the Debtor filed its Disclosure Statement and Plan of Reorganization (Docket Nos. 75 & 76). On June 5, 2012, PRLP filed a *Motion for Extension of Time to File Objection to Approval of Debtor's Disclosure Statement* (Docket No. 86) and the same was granted on June 7, 2012 (Docket No. 87). On June 8, 2012, PRLP filed its *Objection to Approval of Debtor's Disclosure Statement* (Docket No. 88).   On June 14, 2012, the Debtor filed its *Reply to Objection to Approval of Disclosure Statement* filed by PRLP (Docket No. 95).

On June 19, 2012 a hearing was held in which the court considered the following matters: (i) approval of the *Disclosure Statement* (Docket No. 75); (ii) *Motion to Supplement and Clarify Disclosure Statement and Plan, Docket No. 75 and 76* (Docket No. 82); (iii) *Objection to Approval of Debtor's Disclosure Statement* filed by PRLP 2011 Holdings (Docket No. 88) and the Reply  to Objection to Approval of Disclosure Statement filed by PRLP (Docket No. 95); and (iv) *Motion for the Authorization of (1) the Permanent Use of Cash Collateral; and (2) Request that Hearing to Consider Use of Cash Collateral be Held on June 19, 2012* (Docket No. 90). At this hearing, the court ordered as follows:

> "1. After considering the disclosure statement filed by the Debtor (dkt #75), as supplemented by information on tax credits (dkt #82), and the testimony of Ms.

Barroso, the court concludes that the disclosed value of the properties pending to be sold (34 units) is adequate as the same is based on actual post-petition sales, albeit with a minimal difference of 1%, and finds that there is adequate information. Therefore, the disclosure statement, as supplemented, and clarified in open court is hereby approved. A separate order will be entered.

2. There being no opposition, the Debtor's motion requesting clarification of order (dkt #96) is hereby granted. The amount owed to PRLP should have stated as being $14,600,000 and not $45,000,000.

3. After considering the range of value of the properties pending to be sold ($15-$18 million), the amount of secured debt owed to PRLP ($11.5 to $11.7 million), the history of post-petition sales (13, that is, one per month), the statutory requirement that maintenance fees be paid, and the amount of critical expenses, outlined in the budget submitted by the Debtor in its motion for use of cash collateral (dkt #90), the court finds that payment to PRLP of 70% of the sale of individual units constitutes adequate protection. Consequently, the order authorizing the use of cash collateral (dkt #94) is hereby extended up to and including the date of the hearing on confirmation to be scheduled.

4. Audio record to be filed." (Docket No. 105).

On June 25, 2012, the *Order Approving Disclosure Statement* was entered by the court (Docket No. 107). On July 3, 2012, PRLP filed a *Notice of Appeal* from the two (2) Orders entered on June 19, 2012 (Docket No. 105) and on June 25, 2012 (Docket No. 107). The first Order (Docket No. 105) extended a previous Order (Docket No. 94) authorizing the use of cash collateral up to and including the date of the plan confirmation hearing. The second Order approved the Disclosure Statement (Docket Nos. 75 & 82) (Docket No. 112). On July 3, 2012, PRLP filed a motion for leave to appeal these two (2) Orders to the United States District Court premised upon PRLP's allegations that: (i) the court erred in granting the Order extending the use of cash collateral because the Debtor failed to evince the existence of an equity cushion under the fair market value approach pursuant to 11 U.S.C. §363(e) and (p); and (ii) the court also erred in approving the Disclosure Statement because the Debtor failed to prove that the value of the Metro Plaza properties (collateral) pursuant to the fair market value approach was in

conformity (in accordance/compliance) with the provisions of 11 U.S.C. §1125(a)(1) (Docket No. 115). The Debtor filed its opposition on July 16, 2012 arguing that the appealed Orders are interlocutory Orders and that PRLP's request for appeal does not comply with the necessary requirements to grant this request (Docket No. 121). The District Court acknowledged PRLP's appeal on July 23, 2012 (Docket No. 128). The District Court on October 2, 2012 granted PRLP's leave to appeal (Case No. 12-01577 (JAF), Docket No. 8).

On October 25, 2012, PRLP filed an *Urgent Motion for Stay Pending Appeal* (Docket No. 144). On November 20, 2012, the court in its *Opinion and Order* denied PRLP's stay pending appeal because it found that PRLP failed to establish a likelihood to succeed on the merits or show irreparable harm. The court did not find public policy to be an issue at this juncture (Docket No. 150). On December 4, 2012, PRLP filed a *Motion for Reconsideration of Order Denying Urgent Motion for Stay Pending Appeal* arguing that the court should vacate and reverse its November 20, 2012 Order because the court relied on alleged "uncontested valuations" of the Metro Plaza property for which no evidence was presented or proffered by the Debtor (Docket No. 154). The court denied PRLP's motion for reconsideration on December 13, 2012 (Docket No. 160). On June 18, 2012, the Debtor filed a *Motion in Compliance with 11 U.S.C. §1129 Requirements for Confirmation* (Docket No. 164).

On December 19, 2012, PRLP filed its *Objection to Confirmation of Plan of Reorganization (dated April 13, 2012) as Supplemented (on May 8, 2012) (Docket Nos. 76 and 82)* premised upon the following: (i) Debtor's proposed scenario A which is to pay PRLP's allowed secured claim through the partial transfer of PRLP's collateral fails to comply with the indubitable equivalent requirements of 11 U.S.C. §1129(b)(2)(A)(iii); (ii) the plan is not feasible

under all three (3) proposed scenarios[2] and does not comply with the requirements of 11 U.S.C. §1129(a)(11); (iii) the plan as filed has not been proposed in good faith pursuant to 11 U.S.C. §1129(a)(3); (iv) the three (3) scenarios proposed under the plan fail to comply with 11 U.S.C. §1129(a)(7) because PRLP will receive more in a Chapter 7 liquidation based upon the project's current value as per the Appraisal Report; (v) the plan does not provide for PRLP's collection of its deficiency claim (resulting from the current value of the Metro Plaza property as reflected in the Appraisal Report) in the unsecured creditors class in violation of 11 U.S.C. §§1122, 1123 and 1129(a)(10); and (vi) the plan is premised on a Disclosure Statement that contains erroneous information and if the Debtor intends to file a supplement to the plan, the Disclosure Statement should be amended and re-circulated to creditors (Docket No. 165).

On December 27, 2012, a confirmation hearing was held in which the court determined the following: "[t]he confirmation hearing is continued to 02/20/2013 at 9:30am. Debtor is to give notice. Debtor shall file an amended Chapter 11 plan on or before 01/25/13, and give 14 days' notice for objections. Debtor and PRLP Holdings LLC agree to modify the percentage of payments from 70% to 87% for all sales up to confirmation." (Docket No. 174). On January 25,

---

[2] The three (3) scenarios proposed by Debtor in its plan of reorganization dated April 13, 2012 are the following:

"**Scenario A**: The Debtor shall surrender a set number of units to PRLP that is the indubitable equivalent of the Debtor's outstanding obligation on the Effective Date. After satisfying the obligation to PRLP by surrendering property that is the indubitable equivalent of the obligation, all remaining units shall remain with the Debtor and shall be administered by the Debtor to fund its Plan of Reorganization.

**Scenario B**: In agreement with PRLP and QB Construction Inc., for the management and sale of the units, the Debtor shall continue administering and selling units for the benefit of PRLP and provide payment in full of the amounts owed to PRLP within a term of thirty-six (36) months by apportioning a certain percentage of the proceeds from each sale to PRLP. Interest on the outstanding obligation shall accumulate at the same rate agreed pursuant to the original terms and conditions of the loan agreement.

**Scenario C**: Subject to availability of secured financing, the Debtor shall arrange or request a third party to purchase the mortgage note from PRLP in an amount equal to 50% of the outstanding obligation on the Effective Date. Payment of this amount shall be made within ninety (90) days from the signature of the asset purchase agreement. All three scenarios described for treating the claims of this class are impaired." (Docket No. 76).

2013, the Debtor filed its *Amended Plan of Reorganization Dated January 25, 2013* (Docket No. 177). On January 28, 2013, the Debtor filed a Supplement to its Amended Plan of Reorganization to include a release and a "bad boy clause" under proposed scenario A for the payment to secured creditor PRLP (Docket No. 181). The Debtor withdrew the *Supplement to its Amended Plan of Reorganization* (Docket No. 181) on February 20, 2013 and the court granted the Debtor's request (Docket No. 206). On February 11, 2013, the Debtor filed a *Motion in Compliance with 11 U.S.C. §1129 Requirements for Confirmation* (Docket No. 192).

On February 11, 2013, PRLP filed its *Objection to Confirmation of Amended Plan of Reorganization* (Docket No. 177) premised upon the following alleged deficiencies of the amended plan pursuant to 11 U.S.C. §1129: (i) given that Debtor has not been able to reach an agreement with PRLP to date, PRLP assumes that plan confirmation will be sought under scenario B which proposes that Debtor will surrender to PRLP the Metro Plaza Property as the indubitable equivalent "sufficient to cover the entire debt of PRLP as of this date." PRLP objects to proposed scenario B of the amended plan based upon the following: (a) Debtor will not be able to pay PRLP's allowed secured claim in full (PRLP's allowed secured claim amounts to $10,066,548.17) with the turnover of the project based upon Mr. Vallejo's Appraisal Report which appraised the residential and commercial units using a present discounted market value and/or value to a single purchaser of $7.9 million in addition to the parking garage which was appraised at a market value of $1.5 million, for a total value of $9.4 million for the project; and (b) assuming the market value of the project is correct under the Appraisal Report, PRLP would be left with a resulting deficiency claim of approximately $1,109,045.77 which has not been classified or treated under the General Unsecured Class (Class 3). PRLP's objections applicable to both scenarios are the following: (i) the amended plan is not feasible because it fails

to comply with 11 U.S.C. §1129(a)(11), in particular scenario B proposes to pay Class 3 (General Unsecured Creditors) through a capital contribution made by the shareholders of the Debtor. However, the Disclosure Statement does not provide any information as to the shareholders' liquidity or financial capacity to make the required capital contribution; (ii) the Debtor's alleged full payment to Class 3 is speculative because it failed to account for PRLP's $1,109,045.77 deficiency claim; (iii) Debtor does not disclose in the amended plan or the Disclosure Statement how it expects to fund the full payment to Administrative Claims creditors (Class 1) when considering that Debtor's cash on hand is fully encumbered to PRLP, and as of December 31, 2012 was estimated in the amount of $233,678.96; (iv) Debtor's amended plan fails to satisfy 11 U.S.C. §§1122(a) and 1123(a)(4) because it improperly and unreasonably created a new Class 4 to segregate and separate QB Construction, Inc. ("QB") from Class 3 (General Unsecured Creditors) to gerrymander claims to create an impaired accepting class and satisfy part of the requirements under section 1129(b); (v) given that PRLP's deficiency claim must form part of Class 3 (General Unsecured Claims) and the same may be sufficient to control Class 3 pursuant to section 1126(c), it appears Class 4 was created for the purpose of obtaining at least one impaired accepting class for "cramdown" purposes under 11 U.S.C. §1129(a)(10); (vi) the amended plan as filed has not been proposed in good faith pursuant to 11 U.S.C. §1129(a)(3) because it lacks a reasonable probability of meeting the statutory requirements of confirmation and thus, does not comply with the good faith requirement under 11 U.S.C. §1129(a)(3); and (vii) PRLP will not receive more under the amended plan than under a hypothetical liquidation scenario pursuant to section 1129(a)(7) (Docket No. 194).

On February 11, 2013, PRLP filed a *Motion Regarding Adequacy of Disclosure Statement in View of Recent Amendments to Plan* arguing that an Order should be entered

requiring the Debtor to file an amended Disclosure Statement pursuant to 11 U.S.C. §§1125(b) and 1127(c) based upon the following: (i) the segregation of QB into a separate class with a separate treatment must be explained in detail; (ii) the amended plan incorporates the Metro Plaza property values as of December 4, 2012 Appraisal Report. As a result of these updated values, the original Plan's distribution scheme to creditors, cash flow statements, projections and liquidation analysis have been greatly changed in the amended plan; (iii) under scenario B of the amended plan, the Debtor proposes to pay Class 3 in full through a capital contribution made by the Debtor's shareholders. This alternate treatment to unsecured creditors was not included in the original plan. PRLP further argues that Disclosure Statement does not provide any information regarding the shareholders' liquidity or financial capacity to make the required capital contribution within the time frame contemplated in the amended plan; (iv) as to the Administrative Claims (Class 1) Debtor does not disclose in the amended plan or the Disclosure Statement how it expects to fund the full payment to administrative claims; and (v) according to the amended plan, one of the proposed sources of funding is through the sale of tax credits. However no information as to its status has been provided in the Disclosure Statement (Docket No. 195). On February 13, 2013, the Debtor filed its *Response to PRLP's Motion Regarding Adequacy of Disclosure Statement* arguing that there is no need to submit an amended Disclosure statement due to the following: (i) the Appraisal Report was previously submitted by the Debtor to PRLP through the discovery made and to the creditors through the exhibits to the amended plan; (ii) PRLP and all creditors received adequate disclosure to make an informed decision regarding the amended plan of reorganization; (iii) Debtor amended its plan to provide treatment to PRLP's claim in conformity with the new appraisal report prepared by Mr. Vallejo and to satisfy the objections originally raised by PRLP in its objection to confirmation; (iv) the Debtor

concedes that it included a new class (Class 4) in the amended plan which consists of only one unsecured creditor, QB which was originally included under Class 3 (General Unsecured Creditors). QB voluntarily chose to defer the payment of its claim until all other creditors were paid, thus the Debtor classified their claim separately. This amendment benefits unsecured creditors in Class 3 and does not prejudice PRLP because payment to all junior classes has always been proposed after PRLP is paid in full; (v) the Debtor has obtained accepting votes under Class 3 and QB construction has also accepted the plan. Thus, the Debtor does not need to file an amended Disclosure Statement because QB construction has accepted the plan; (vi) PRLP's argument that it would have the controlling vote under Class 3 if it was allowed a deficiency claim in the amount of $1.1 million is misplaced because if QB were a creditor under Class 3, it would be the Debtor's largest unsecured creditor (QB has a claim in the amount of $3,270,383) which exceeds PRLP's alleged deficiency claim. All other creditors under Class 3 who voted on both occasions have accepted the plan; (vii) it has been clearly established that if the modified plan materially and adversely changes the way a creditor is treated then the claim or interest holder is entitled to a new disclosure statement and another vote. In this case, both requirements have not been met. The terms of the treatment to the classes are essentially the same. The Debtor has maintained the same percentage and the term in which the payment will be made. The modification is in the mechanics in which the payment is going to be and the source of funds; and (viii) the Debtor has provided to PRLP in its response to the production of documents served all available information with respect to the procurement of these tax credits (Docket No. 200).

On February 20, 2013, a confirmation hearing of the amended plan of reorganization dated January 25, 2013 was held in which the Debtor and PRLP proffered to have an agreement

pursuant to scenario A of the Chapter 11 plan which provides that the Debtor will retain the property and PRLP will retain its liens and will receive deferred cash payments within thirty-six (36) months. The key aspects of the agreement were summarized in open court. The parties agreed to file a written stipulation within fourteen (14) days (Docket No. 206). On March 5, 2013, the Debtor filed a *Motion Requesting Short Extension of Time to Submit Stipulation* (Docket No. 213) and the court granted said motion (Docket No. 214). On March 16, 2013, the Debtor filed a Second Motion Requesting Short Extension of Time to Submit Stipulation (Docket No. 216) and the same was granted (Docket No. 217). On March 18, 2013, PRLP filed a *Motion Requesting Extension of Time to Submit Stipulation* informing the court that the parties require until March 25, 2013 to finalize negotiations and to file the stipulation (Docket No. 219). On March 19, 2013, the court granted the motion (Docket No. 220). On March 22, 2013, PRLP filed a second *Motion Requesting an Extension of Time to Submit Stipulation* requesting until April 1, 2013 to finalize negotiations and file the stipulation (Docket No. 224). The court granted PRLP's second motion requesting an extension of time (Docket No. 226). On April 1, 2013, the Debtor filed a third *Motion Requesting Extension of Time to Submit Stipulation* until April 11, 2013 for counsel for the Debtor to review and finalize the stipulation (Docket No. 228). The court granted the Debtor's third motion for an extension of time (Docket No. 229).

On March 28, 2013, the United States District Court for the District of Puerto Rico affirmed the two (2) Orders appealed by PRLP in which the Bankruptcy Court held the following: (i) authorized the Debtor to use the cash collateral up to and including the date of the hearing on confirmation; and (2) found that the Disclosure Statement, as supplemented, provided adequate information and approved the same (Docket No. 230).

On April 30, 2013, the Debtor filed a *Motion to Request Hearing for Confirmation of Debtor's Plan* informing the court to schedule a confirmation hearing because the parties have been unable to reach an agreement regarding certain clauses of the stipulation (Docket No. 233). On May 13, 2013, an *Order and Notice* was docketed by the court scheduling a confirmation hearing for July 3, 2013 (Docket No. 236). On June 11, 2013, the Debtor filed a *Motion Requesting Continuance for Confirmation Hearing and Request for Alternate Dates* because appraiser Luis E. Vallejo will be out of Puerto Rico during the month of July and his assistance to the confirmation hearing is key since he will testify as to the value of the collateral (Docket No. 242). On June 19, 2013 the court docketed an *Order and Notice Rescheduling Confirmation Hearing* to September 18, 2013 (Docket No. 244). On September 17, 2013, the Debtor filed an *Informative Motion as to Stipulation by and between Debtor and PRLP 2011 Holdings, LLC* informing the court that an agreement has been approved as of this date by the majority of the shareholders but is missing the signature and approval of all shareholders as required by the secured creditor. Once the stipulation is approved by all the shareholders the same will be filed with the court (Docket No. 259).

On September 18, 2013, a hearing was held in which the court stated the following: "[t]he hearing is continued without a date. The plan is consensual; all classes have accepted [the] plan, including PRLP on account of agreement to be filed within 7 days. Payments to HOA detailed in par[agraph] 21 of the stipulation. Maintenance fees to be paid on the effective date of the plan. Parties granted 14 days to object to stipulation. Objection language to be included and notified to all parties in interest. Parties to move the court within 14 days after stipulation is filed." (Docket No. 260). On September 25, 2013, a *Joint Stipulation by and between Debtor and PRLP 2011 Holdings LLC* was filed to resolve outstanding issues between the parties

-14-

regarding confirmation of the amended plan of reorganization and request the court's approval of the same (Docket No. 263). On October 9, 2013, the Consejo de Titulares del Condominio Metro Plaza Tower ("HOA") filed an *Objection to Stipulation filed by Debtor* (Docket No. 270). On October 28, 2013, the court entered an *Order and Notice* scheduling a hearing for January 14, 2014 to consider the joint stipulation and HOA's amended objection to the stipulation (Docket No. 272). On November 1, 2013, PRLP filed its *Response to the Homeowners Association's Objection to the Stipulation* (Docket No. 282). On November 13, 2013, the HOA filed a *Reply Memorandum to PRLP 2011 Holdings LLC's Response to the Homeowner Association's Objection to the Stipulation (Docket #282)* (Docket No. 283). On January 13, 2014, the HOA initiated an adversary proceeding against the Debtor and PRLP seeking a declaratory judgment as to whether the maintenance fees of unsold apartment units and the curing of the deficiencies allegedly caused by the Debtor's omission to the state law imposed constitute administrative expenses pursuant to 11 U.S.C. §503(b)(1)(A) (Docket No. 295).

On January 14, 2014, a hearing was held to consider the joint stipulation and HOA's objection to the same. At the hearing, he Debtor informed the court that PRLP requests the HOA to withdraw the complaint it filed yesterday against PRLP with prejudice requesting PRLP to pay the maintenance fees. The Debtor also informed that there is no longer an agreement. Thus, the court ordered the Debtor to inform within 60 days if a valuation hearing is necessary or if an agreement had been reached. The hearing was continued to April 1, 2014 (Docket No. 296).

On March 11, 2014, PRLP filed a *Motion for Extension of Time* of fourteen (14) days to supplement its objections to Debtor's amended plan (Docket No. 311). PRLP's motion requesting an extension of time was granted on March 13, 2014 (Docket No. 313). On March 14, 2014, the Debtor filed a *Motion Requesting Valuation Hearing under 11 U.S.C. 506 and*

*F.R.B.P. 3012 in Order to Proceed under Section 1129(b)(2)(A)(iii) as to PRLP* by which it informed the court of the following: (i) since there is no agreement with PRLP, Debtor has decided to surrender the totality of the property which serves as collateral to PRLP as the indubitable equivalent of its secured claim (as reduced); (ii) pursuant to the most recent certification received from PRLP as of this date, the debt amounts to $6,124,608 in principal and interest plus $197,507.21 in attorney's fees; (iii) the "market value" of the property that constitutes the collateral of PRLP exceeds the amount of the debt pursuant to Debtor's appraisal report; (iv) the Debtor will proceed with the confirmation of its amended plan under scenario B pursuant to Section 1129(b)(2)(A)(iii) surrendering "all the property" that constitutes the collateral of PRLP; (v) the "market value" of the property that will be surrendered needs to be determined since the value is in controversy; and (vi) it is Debtor's position that the "market value" approach should be used in cases in which the "total property" that serves as collateral will be surrendered as the indubitable equivalent  (Docket No. 314).

On March 25, 2014, PRLP filed its *Supplement to Objection to Confirmation of Amended Plan of Reorganization (Docket No. 177)* objecting to debtor's Amended Plan of Reorganization for several reasons. However, at this juncture the court will focus only on the reasons regarding the issue as to the valuation of the collateral (real estate) which consist of the following: (i) Scenario B fails to provide for the payment of PRLP's unsecured deficiency claim because Debtor will not be able to pay the entirety of PRLP's allowed claim even with the turnover of the project; (ii) the plan is not confirmable because it fails to comply with the indubitable requirements of 11 U.S.C. §1129(b)(2)(A)(iii); (iii) surrendering the collateral does not satisfy PRLP's allowed claim, as there remains a $2,000,000 deficiency pursuant to the Appraisal Report prepared by Mr. Rafael Bonin which concludes that the market value as of March 11,

2014 of the remaining property (the residential and commercial units) is $4,300,000; (iv) the Debtor's appraiser, Mr. Vallejo in his most recent appraisal report dated February 2014 included two (2) different conclusions of value, namely; the discounted value and the value to a single purchaser. Mr. Vallejo concluded that the discounted value of the collateral is $4,950,000. This is the Appraisal Report that the Debtor considered to propose scenario B of the amended plan; (v) the discounted present market value as explained by the Appraisal Report prepared by Mr. Bonin and supported by Mr. Vallejo's Appraisal Reports (for the years 2012 and 2014) is the value that is currently consistent with the applicable case law; (vi) the appropriate valuation method is the market value to a single purchaser. This valuation methodology subtracts from the aggregate retail value of the project certain costs such as: marketing, overhead, legal fees, taxes, loss of loan interest and sales expenses, and other opportunity costs. Then, the resulting cash flows are then discounted to present value using an appropriate discount rate (Docket No. 327). On March 28, 2014, the Debtor filed a *Motion to Reaffirm Withdrawal of Joint Stipulation filed on September 25, 2013 (Docket No. 263)* (Docket No. 348).

On March 29, 2014, the Debtor filed its *Response to PRLP's Objections to Confirmation of Amended Plan of Reorganization dated January 25, 2013 as Supplemented (Dkts. 177, 181, 194, 315, 327, 336)* arguing that the amended plan fully complies with the requirements under Section 1129(a) and (b) based upon the following: (i) this is a 100% plan plus interests to be paid at the prime rate; and (ii) the amended plan will be funded as follows: (1) the collateral to secured creditor PRLP; (2) the income from the sale of the tax credits which have been approved in the amount of $4,995,237.00 and if necessary; and (3) the plan proposes a shareholders' contribution. The Debtor does not expect the shareholders' contribution because the tax credits have already been approved before the confirmation of the amended plan. The Debtor further

argues that even in the worst case scenario, meaning that the court would agree with PRLP that the appropriate valuation methodology is the market value to a single purchaser or bulk sale value, it would still have sufficient funds to pay PRLP. The Debtor for illustrative purposes uses the following math computation under the worst case scenario: (a) Assets: (i) valuation of collateral in bulk sale provided by Mr. Bonin with a value of $4,300,000; (ii) tax credit proceeds in the amount of $4,995,237; (iii) total assets that amount to $9,295,237; (b) Liabilities: (i) less PRLP's alleged secured debt $6,376,980.54; (c) Net for unsecured $2,918,256.46: (i) minus HOA's claim in the amount of $1,400,000 (this amount is disputed); (ii) minus the general unsecured creditors' claims which amount to $41,065; (d) net amount of $1,477,191.46 for QB; and (e) shareholders will only be paid after all superior classes have been paid in full (Docket No. 352). Moreover, the Debtor also argues that PRLP's position as to its claim being under-secured is contradictory because PRLP is claiming payment for post-petition interests in the amount of $488,949.53 and legal fees in the amount of $202,529.50 plus "other costs" in the amount of $40,411.78. Debtor sustains that PRLP's alleged unsecured claim will not amount to $2 million but it will be in the amount of $1,345,089 because under-secured claimants are not allowed post-petition, interests, attorneys' fees and costs (Docket No. 352).

On March 31, 2014, the Debtor filed its *Limited Objections to Claim No. 7 filed by PRLP* based upon a debt certification in which PRLP provides a breakdown of its claim (which is for the total amount of $6,376,980.54) which is as follows: (i) the principal owed is in the amount of $5,645,089.73; (ii) the accrued interests owed are in the amount of $488,949.53; (iii) legal fees in the amount of $202,529.50; and other costs in the amount of $40,411.78. Debtor's objection is premised upon the following arguments: (i) PRLP must comply with 11 U.S.C. §506 which requires that PRLP prove that its claim is over-secured; (ii) show that the loan documents

-18-

provide for attorneys' fees, costs, and charges; (iii) and that such fees, costs and charges are reasonable (Docket No. 353).

On April 1 and 2, 2014, a confirmation hearing was held to consider various matters such as: (i) the joint stipulation between Debtor and PRLP; (ii) the objection to the joint stipulation filed by HOA; (iii) PRLP's response to the HOA's objection; and (iv) the bridge order granting amendment of the interim order authorizing the use of cash collateral (Docket No. 358). The court ordered that the hearing be continued to April 8, 2014 and the parties were ordered to brief the issues of appraisal methodology and applicable law as to the appraisals by April 7, 2014.

On April 7, 2014, PRLP filed an amended proof of claim #7-2 in which it lists its claim as of the petition date in the amount of $14,496,907.24. PRLP in its proof of claim references the Annex for certain line items such as the value of property, amount of the secured claim and the amount unsecured. In the *Annex to Proof of Claim*, PRLP discloses that it filed this supplement to the claim to submit the revised amount of its claim as of March 25, 2014. PRLP states that the Debtor owes PRLP as of March 25, 2014 the total amount of $6,376,980.54 which consists of the following components: (i) $5,645,089.73 in principal; (ii) $488,949.53 in accrued interest; (iii) $202,529.50 in legal fees; and (iv) $40,411.78 in other costs (Claims Register, proof of claim #7-2, Exhibit A). PRLP states that all proceeds received after the petition date from the sale of the real estate has been applied to principal, not to interest or fees. PRLP also discloses that the appraisal report prepared by McCloskey, Mulet & Bonnin Appraisers, P.S.C. dated March 17, 2014 concludes that the value of PRLP's collateral is $4,300,000, thus Debtor's proposed surrender of the collateral to PRLP as the "indubitable equivalent" will result in a deficiency of no less than $2,076,980.54. On April 8, 2014, the Debtor filed its *Reinstated Objections to Claim No. 7-1, as Amended Last Night by PRLP and Objection to be Included as New Evidence*

-19-

*in Trial and Request that it be stricken from the Record and that the Attorneys and Law Firm be Disqualified* (Docket No. 363).

<u>*Parties Positions as to Valuation of Collateral*</u>

<u>*Ponce de León 1403, Inc.*</u>

On April 7, 2014, the Debtor filed its *Memorandum of Law as to the Valuation Method to be Used Under 11 U.S.C. §506 and 11 U.S.C. §1129(b)(2)(A)(iii) when the Complete Collateral is to be Surrendered as the Indubitable Equivalent and Applicable Appraisal Standards and Guidelines* arguing that the appropriate methodology that should be employed when the Debtor's amended plan provides for the surrendering of the entire collateral as the "indubitable equivalent" pursuant to 11 U.S.C. §1129(b)(2)(A)(iii) is the aggregate of the "fair market value" of the individual units of the collateral to which some administrative expenses need to be discounted from the value and not the "value to a single purchaser" or "bulk value" methodology in which certain expenses and a profit component are deducted to reduce the fair market value (Docket No. 361). The Debtor in its memorandum argues as follows: (i) the value of the collateral must be determined as of confirmation date pursuant to 11 U.S.C. §506(a). Section 506(a)(1) provides that the value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest;" (ii) the value to a single purchaser methodology is appropriate when the Debtor proposes to surrender as the indubitable equivalent of the secured claim only part of the collateral under a "dirt for debt" plan. The courts in "dirt for debt"[3] cases have consistently followed the application of the "bulk sale" values to guarantee the "profit" of the secured creditor's investment when receiving a portion of its

---

[3] The term "dirt for debt" is discussed below as it relates to providing the indubitable equivalent for a secured claim.

collateral as the indubitable equivalent pursuant to 11 U.S.C. §1129(b)(2)(A)(iii); (iii) if the entire collateral will be surrendered, then the appropriate methodology is the aggregate retail value of each unit that constitutes the entire collateral, thus individual appraisals must be prepared for each unit; (iv) in In re Claredon Holdings, LLC, 2011 WL 5909512; Bankr. LEXIS 5313 (Bankr. E.D.N.C. 2011) the court concluded that when all of the property that is subject to the creditor's collateral is being surrendered within the context of 11 U.S.C. §§506(a) and 1129(b)(2)(A)(iii), the appropriate value to be applied is the property's fair market value; (v) in In re Sailboat Properties, LLC, 2011 WL 1299301 (Bankr. E.D.N.C. 2011) the court adopts a four (4) step "highest and best use" inquiry which considers the following: (1) what is the highest and best use of the collateral?; (2) what use of the collateral will yield the highest net value; (3) is the highest and best use of the collateral the use that will yield the highest net value?; and (4) is that use reasonably available to the secured creditor?; (vi) if the four prong test is applied in this case, "the current use is the highest and best use of the property subject to the collateral of PRLP is the property's current use which is also the most likely to yield the highest net value, and that the use of a professional to market the sale of the property is reasonably available to PRLP as a means of disposing of the property;" (vii) the court in In re Sailboat Properties, LLC held that the fact that the property will be owed by the bank, does not alter the highest and best use of the property; and (viii) courts have rejected to adopt a foreclosure sale market price when the entire collateral is to be surrendered to the secured creditor (Docket No. 361).

The Debtor in its memorandum of law presented the following position as to the Uniform Standards of Professional Appraisal Practice ("USPAP"): (i) USPAP represents the generally accepted and recognized standards of appraisal practice in the United States. USPAP provides a minimum set of quality control standards for the conduct of appraisal in the United States, but it

-21-

does not prescribe specific methods to be used. Rather "…USPAP simply requires that appraisers be familiar with and correctly utilize those methods which would be acceptable to other appraisers familiar with the assignment at hand and acceptable to the intended users of the appraisal." This particular standard is the scope of work rule; (ii) USPAP does not preclude the appraiser from presenting the appraisals of the individual units without having to perform a discounted cash flow analysis to reach the bulk value; (iii) "PRLP claims that the [d]iscounted [c]ash [f]low analysis was required in this case because the project is a track land development that has more than five (5) unsold units that are constructed as a single development. This conclusion is based [o]n a citation from the Interagency Appraisal and Evaluation Guidelines and is applicable and misleading. The Interagency Appraisal and Evaluation Guidelines are applicable when a financial institution, subject to the FIRREA provisions and other federal banking regulations is going to finance a track of land development. This is not the case before the court. Compliance with the discounted cash flow analysis is not required in this specific case;" and (iv) the proper analysis is the individual market value of the remaining units with the deduction of the applicable operating expenses or holding costs (Docket No. 361).

Subsequent to the confirmation and valuation hearings, the Debtor filed its *Proposed Findings of Facts and Memorandum of Law in Support of Confirmation of Debtor's Plan of Reorganization and Valuation of Collateral* (Docket No. 404). As to the findings of fact regarding the valuation hearing, the court has included herein the testimonies of the three (3) appraisers from which it will derive its own findings of facts which are crucial to determining the appropriate appraisal methodology and the value of the subject property.

As stated before, at this juncture, the court will only focus on the legal valuation arguments that were not included in the parties' previous memoranda since the other

-22-

confirmation issues will be affected by the ultimate resolution of the valuation issue.  The Debtor's additional valuation arguments brought forth in its memorandum were the following: (i) "[a]s to PRLP's alleged deficiency claim, it has been determined by certain courts that when the collateral is itself surrendered there is no right to a deficiency claim. See In re Western Real Estate Fund, Inc., 109 B.R. 455 (Bankr. W.D. Okla. 1990); ("a [c]reditor to which a Chapter 11 debtor proposed to transfer its collateral property was not entitled to unsecured claim in the amount by which its total claim exceeded value of the collateral property"); (ii) in In re Sandy Ridge Development Corporation, 881 F. 2d 1346 (5th Cir. 1989), two (2) axiomatic rules were established as a guideline to determine the indubitable equivalent of a secured creditor's claim when the Debtor proposed to surrender the collateral; namely: (1) "[t]he valuation of the assets of a debtor in bankruptcy is an integral part of the confirmation process under Chapter 11" and (2) "[t]he transfer on plan approval of all its collateral to a secured creditor, at a value properly fixed by the bankruptcy court, gives that creditor the indubitable equivalent of its secured claim;" (iii) "case law establishes a four (4) tier test to prove the indubitable equivalent: (a) [t]he ability of the Debtor to deed back real estate in satisfaction of the claim (in other words surrender the property); (b) [t]he ability of the Court to place a value on the property for indubitable equivalent purposes. Under 11 U.S.C. §506 the Court can value the property at confirmation date and does not need to base the value of the collateral on its foreclosure value or at the time the secured creditor disposes of the property; (c) [t]he risk placed upon the creditor by being forced to accept the property in satisfaction of the claim. The Court will adjust the appraiser's value in view of the inherent risks. This does not mean that the Court has to provide a liquidation value or a safety net for the loss. The Court will therefore discount the reasonable expenses and a discount rate; and (d) [t]he actual treatment received by the creditor under the Plan;" (Docket No. 404, pg. 37);

and (iv) "[f]or confirmation purposes it may be possible that under these circumstances a discount to the "fair market value" of the collateral be allowed in order to compensate the creditor the costs and delays associated with liquidating the collateral" In re Immanuel LLC, 2011 Bankr. Lexis 1015 (Bankr. W.D. Mich. 2011); (v) "[t]he deep discount applied to the collateral when the "Market Value to a Single Purchaser" or "bulk value" is applied, is generally used when debtors propose plans which only surrender part of the collateral or "dirt for debt" plans. That is, when the debtor proposes to make a partial return of the collateral in full satisfaction of the secured claim, based on the appraised value. See page 11 of PRLP's Supplement citing Centennial Park, LLC, 2011 WL 5520969 (Bankr. Kansas 2011), In re Bannerman Holdings, LLC 2010 WL 426003 (Bankr. E.D.N.C. 2010), In re Fazekas, Case No. 92-02262-8JRL (Bankr. E.D.N.C. 1993), In re Clarendon Holdings, LLC, 2011 WL 59095212 (Bankr. E.D.N.C. 2011), In re Sailboat Properties, LLC, 2011 WL 1299301 (Bankr. E.D.N.C. 2011);" and (vi) the court shall not deduct the profit component in any scenario and under any of the valuations presented in evidence because it is not mandatory and inappropriate according to the facts of this case. "As in Sailboat we conclude that the inclusion of a profit component is inappropriate in this case when the project is completed and 91% sold. The case law includes that the profit component is used if the property's highest and best use is to be sold in bulk lots, not individual sales. The risk is borne by the secured creditor and any discount on account of their choice to dispose of the property must not interfere with a determination of the highest and best use of the property for valuation purposes." (Docket No. 404).

*PRLP*

On April 7, 2014, PRLP filed its *Brief on Valuation for Hearing on Confirmation of Amended Plan* arguing that since the Debtor plans to surrender the collateral to PRLP a

conservative approach in valuation is appropriate due to the following: (i) the Debtor is shifting the risk of loss to the secured creditor; (ii) the secured creditor will not be earning any interest on its secured claim until the collateral is sold; and (iii) valuation is an inexact science. PRLP further argues that of the three (3) appraisal reports before the court, two (2) appraisals submitted by PRLP and by the Debtor follow the same methodology; namely, the discounted market rate to a single purchaser. This methodology was followed by Mr. Luis E. Vallejo as the court approved appraiser for the Debtor and by Mr. Rafael Bonnin as PRLP's appraiser. Both appraisers concluded in their appraisal reports that PRLP is an under secured creditor for purposes of the indubitable equivalent. The third appraisal by Mr. Gaztambide "appears to have been made-to-order by the Debtor, as it disregards the methodology and professional standards applicable to rendering a conclusion of value (Docket No. 362).

PRLP in its brief explains in detail the applicable USPAP standards, guidelines and rules that should be applied in the valuation of the collateral. The first rule PRLP discusses is the Scope of Work rule which states: "For each appraisal and appraisal review assignment, an appraiser must: 1-identify the problem to be solved; 2. Determine and perform the scope of work necessary to develop credible assignment results; and 3. Disclose the scope of work in the report." [4] The appraiser to properly identify the appraisal problem to be solved must identify the following elements: (i) client and any other intended users; (ii) intended use of the appraiser's opinions and conclusions; (iii) type and definition of value; (iv) effective date of the appraiser's opinions and conclusions; (v) subject of the assignment and its relevant characteristics; and (vi) assignment conditions. See USPAP 2014-2015, pg. U-13.

---

[4] PRLP attaches to its brief various Exhibits, but fails to include the specific citations throughout its brief. PRLP cites the 2014-2015 Uniform Standards of Professional Appraisal Practice (USPAP), pg. U-13, The Appraisal Foundation.

In applying the Scope of Work rule in the instant case, the appraiser must consider the following: (i) the subject property is a single property that consists of a group of 15 residential and 2 commercial units in a completed condominium; (ii) the intended use of the report is a bankruptcy proceeding in which the Debtor's amended plan proposes to surrender the subject property as the "indubitable equivalent;" (iii) the type of value being sought is market value of the subject property in "as is" condition as of the effective date of value; (iv) market value is to be estimated in cash; and (v) the appraisal methodology must consider the above property characteristics and assignment conditions. The definition of market value as defined in The Appraisal of Real Estate, 13th edition, published by The Appraisal Institute in the year 2008 is as follows: "[t]he most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress."

PRLP next discusses the "highest and best use" standard which is defined as: "[h]ighest and best use is the reasonably probable and legal use of vacant land or an improved property that is legally permissible, appropriately supported, financially feasible, and that results in the highest value." PRLP fails to disclose the source of this definition in their motion. [5] The court notes that

---

[5] PRLP references Standards Rule 1-3(b) regarding the highest and best use definition. However, the 2014-2015 USPAP Standards Rule 1-3(b) does not define the highest and best use, but it discusses this concept under Standard 1: Real Property Appraisal, Development. Standards Rule 1-3 states the following: "[w]hen necessary for credible assignment results in developing a market value opinion, an appraiser must:

    (a) identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends; and

    Comment: An appraiser must avoid making an unsupported assumption or premise about market area trends, effective age, and remaining life.

Mr. Bonnin in his Appraisal Report under the Highest and Best Use Analysis includes the definition of highest and best use as defined by the <u>Dictionary of Real Estate Appraisal</u>, Fifth Edition published by the Appraisal Institute as:

> "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."

Mr. Bonnin concludes that the highest and best use for the subject property components is "the continuation of the existing residential and commercial uses. For the residential components, this would be at prices that generate adequate absorption. For the commercial component, this would be at prices that stimulate a sale, or rent levels that stimulate their leasing."[6]

To support its position regarding the appropriate appraisal methodology, PRLP cites in its brief references to USPAP Advisory Opinion 23 (AO-23), which provides advice from the

---

> (b)  Develop an opinion of the highest and best use of the real estate.
>
> <u>Comment:</u>  An appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraiser's highest and best use conclusion(s)." (2014-2015 USPAP, pgs. U-18 & U-19).

[6] The court notes that Mr. Bonnin's Appraisal Report dated March 17, 2014, under the Highest and Best Use Analysis section, Mr. Bonnin's complete highest and best use analysis as to the subject property is the following:

"[t]he subject project is currently completed in construction.  It was designed as a mixed-use project, with a residential component of 174 apartment units, a commercial component of two (2) commercial ground floor locales, and a public parking garage. Of the 174 residential units, 159 or 91% have been sold. Changing the use of the remaining 15 subject residential units to any use other than the allowed residential would therefore not be legally permissible. The same occurs with the commercial locales. These uses are physically possible. As will be demonstrated in the valuation sections to follow, the real estate market for residential and commercial uses [in] this location has deteriorated in the past several years, resulting in price and rent reductions and increased vacancy. Based on the foregoing, we conclude that the highest and best use of the subject property components is the continuation of the existing residential and commercial uses. For the residential components, this would be at prices that generate adequate protection. For the commercial component, this would be at prices that stimulate a sale, or rent levels that stimulate their leasing." (Claims Register, proof of claim #7-2, Exhibit B, pg. 43).  Appraisal Report was admitted into evidence at April 8, 2014 hearing.

Appraisal Standards Board ("ASB") regarding appraisal problems and issues in determining which characteristics of a real property are relevant to its appraisal. AO-23 addresses the appraisal issue of a client that finances a real estate development project for use in a single-family residential tract development financing package and requests an opinion as to the value for the project. This example involves five properties which consist of the project plus four (4) floor plans. The project in this example involves finished sites and construction and sale of finished homes over a period of years. The values are market value and the effective date of value is at a current date. The intended use is for securing the development loan and the take-out loan commitment. The opinion distinguishes the focus of the appraisal based upon the type of financing being requested. "For the development loan, the subject's relevant characteristics are those of the project, not the homes, and the scope of work to analyze the market for the project must address the entire project's characteristics. For each take-out-loan, the relevant subject property is an individual finished home, not the project, and the summation of the value for those individual homes is not meaningful in terms of the value of the project. Indeed, summation of the value of the individual homes to indicate the market value of the project is incorrect development, and reporting such a summation as market value of the project is misleading. The scope of work necessary to analyze the market for an individual home as a subject property is significantly different from that necessary to analyze the market for the project as a subject property." See USPAP Advisory Opinions 2014-2015 Edition, pg. A-83.

PRLP, without explaining the similarities and/or differences between the subject property in the example and the Debtor's subject property, concludes as follows:

> "The preceding example, as applied for the subject property, means that there [are] 18 properties in the subject assignment: the subject group of properties which are subject to a single loan, plus each of the 17 individual condominium

-28-

units. And as stated in the example, summation of the value of the individual units to indicate the market value of the project (in this case the 17 unsold units at the project) would be incorrect development, and reporting such summation as the market value of the project is misleading and unreliable." (Docket No. 362, pg. 9).

PRLP also incorporates USPAP Advisory Opinion 30 (AO-30) in its valuation brief which addresses the issue of the appraiser's obligations when performing a real property appraisal for use by a federally regulated financial institution. PRLP argues that the Interagency Appraisal and Evaluation Guidelines were developed to assure sound lending practices and the same provide guidance as to the correct methodology for appraising the subject property. PRLP cites the Interagency Appraisal and Evaluation Guidelines – 2010 to support its position that the real estate property that constitutes its collateral must be valued under the bulk sale value methodology also known as the market value to a single purchaser. PRLP argues that pursuant to the Interagency Appraisal and Evaluation Guideline an appraiser must, among other things: "[a]nalyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units." (Interagency Appraisal and Evaluation Guidelines, pg. 8).

PRLP in its brief argues that the real estate project (or its real estate collateral) fits the definition of a tract development project within a condominium which has more than five (5) unsold units pursuant to the Interagency Appraisal and Evaluation Guidelines, and as such, certain deductions and discounts must be accounted in the appraisals to obtain market value. A tract development is defined as: "a project of five units or more that is constructed or is to be constructed as a single development. For purposes of these Guidelines, 'unit' refers to: a residential or commercial building lot, a detached single-family home, an attached single-family home, and a residence in a condominium, cooperative, or timeshare building." See Interagency

Appraisal and Evaluation Guidelines, Appendix D, pg. 44. "Appraisals for these properties must reflect deductions and discounts for holding costs, marketing costs, and entrepreneurial profit supported by market data. In some cases entrepreneurial profit may be included in the discount rate." See Interagency Appraisal and Evaluation Guidelines, Appendix C, pg. 37. In appraising condominiums with unsold units the Guidelines provide:

> "For proposed construction and sale of a condominium building with five or more units, the appraisal must reflect appropriate deductions and discounts. Appropriate deductions and discounts should include holding costs, marketing costs, and entrepreneurial profit during the sales absorption period of the completed units. If an institution finances construction of a single condominium building with less than five units or a condominium project with multiple buildings with less than five units per building, the institution may rely on appraisals of the individual units if the institution can demonstrate through an independently obtained feasibility study or market analysis that all units collateralizing the loan can be constructed and sold within 12 months. However, the transaction should be supported by an appraisal that analyzes and reports appropriate deductions and discounts if any of the individual units are not completed and sold within the 12-month time frame." See Interagency Appraisal and Evaluation Guidelines, Appendix C, pg. 38.

Thus, PRLP argues that since the subject property has more than 5 units with an estimated absorption period of 18 months the appraisal of the subject property must reflect deductions and discounts for holding costs, marketing costs, and entrepreneurial profit supported by market data.

PRLP also includes certain terms such as: bulk value scenario and sum of the retail values to distinguish the same and their application within the appraisal methodology. PRLP references a book titled Subdivision Valuation published by the Appraisal Institute in 2008 and authored by Don M. Emerson, Jr., MAI, SRA. PRLP states as follows regarding Bulk Value Scenario:

"The valuation scenario employed in the subdivision valuation and other valuation problems in which a group of properties are evaluated under a bulk sale scenario. This valuation scenario has as its premise the valuation of a group of lots or units to one purchaser; it is a market value estimate that recognized a specific valuation scenario that is based on the presumption of a transaction where a group of lots are to be sold to one purchaser as one sales transaction. [T]he value estimate must reflect this bulk sale scenario and recognize that the only way the purchaser can earn a profit on the investment is to eventually sell lots or units over time to eventual end users.

The bulk sale scenario considers the absorption period needed to market the lot inventory over time with appropriate deductions and discounts for holding and sales costs as well as a profit. This analysis assumes that time is of the essence and that lot or unit inventory will be made available for sale to match available market demand and at market supported retail lot or unit values."

PRLP states the following as to the Sum of the Retail Values:

"The aggregate of the individual retail prices of a group of lots or units typically sold over a holding or absorption period. Historically, the sum of the retail value has also been known as gross retail value, aggregate of retail values, gross sell-out, gross sellout value, or gross retail value." [7]

As to the applicable law, PRLP argues that 11 U.S.C. §506(a) dictates that valuation of the creditor's interest must be based on the purpose of the valuation and proposed disposition or use of such property, which in this case is that the Debtor is proposing to surrender all the property that constitutes PRLP's collateral.  PRLP further argues that a conservative approach to valuation must be employed because of the risks being shifted to PRLP upon surrender of the collateral such as: (i) the risk of any loss in the value of the real property; (ii) PRLP will receive no interest until it can sell the property; (iii) the Court's determination of the value of the real property is very inexact (Docket No. 362, pg. 18). PRLP also argues that the bar for finding the indubitable equivalence is exceedingly high and as such the Debtor must prove the indubitable

---

[7] The court could not find the statement made by PRLP in the cited source document.

equivalence akin to a clear and convincing standard. Thus, for a court to make a finding that a creditor has received the indubitable equivalence of its secured claim there must be "no doubt that the secured creditor receives consideration equal to its claim in value or amount" In re Philadelphia Newspapers, LLC, 599 F. 3d 298, 326 (3rd Cir. 2010). PRLP argues that courts have held there is a multi-step process to determine the value of property the Debtor intends to surrender which consists of the following: (i) the first step in valuing the collateral is to determine the present market value of the individual units based upon the sales comparison approach; (ii) the second step is to estimate the yearly cash flow generated from the unit sales along with an appropriate absorption rate; (iii) the third step is to subtract the estimated expenses form cash flows; and (4) the last step is to discount to present value the estimated net cash flow. See In re Centennial Park, LLC, 2011 WL 5520968, *3 (Bankr. Kansas 2011) (Docket No. 362, pgs. 19-20). Both the Bonnin and the Vallejo appraisals employed this valuation methodology.

The Hearing

On April 8, 2014 a valuation hearing was held in which appraisers Mr. Carlos Gaztambide Acosta, Mr. Luis E. Vallejo Romeu and Mr. Rafael G. Bonnin Suris testified under oath. The court after hearing the experts' testimonies determined that: "… the proper valuation methodology for the properties to be surrendered to PRLP Holdings is the discounted market value to a single purchaser or bulk sale value. Key factors for the conclusion are: proposed plan provides for the surrender of all unsold units to PRLP, appraisal by Mr. Gaztambide was done in response to the request by Mr. Paul Lavergne to determine the value of the individual units, that sales comparison approach was used for residential units and income approach for commercial units, that there is an active market to sell individual units, that the highest and best use is to sell units individually that he would not consider (as owner) to sell units in bulk, that the list of

-32-

asking prices in Exhibit D-5B is not the market value but the owner's decision, and that he was not aware at the time he made the appraisal, that the plan provided for bulk surrender." The hearing was continued to and held on April 24, 2014. (Docket No. 366). On May 19, 2014, PRLP filed its *Proposed Findings of Facts and Conclusions of Law on Hearing on Confirmation* (Docket No. 405) which includes the same arguments as its prior memorandum regarding the applicable law as to valuation and as to the applicable appraisal methodology that should be used in this particular case.

*Expert Testimonies of Real Estate Appraisers at the Valuation Hearing*

*Mr. Carlos Gaztambide- Real Estate Appraiser*

Mr. Carlos Enrique Gaztambide Acosta, real estate appraiser, MAI (Member of the Appraisal Institute), testified that in his 43-44 years of experience as a real estate appraiser he has had vast experience appraising multi-use properties like the Debtor's project. Mr. Gaztambide stated that he has been an expert witness in valuation court proceedings since 1974. He stated that Mr. Paul Lavergne requested that he estimate the market value for each individual unit. The subject property consisted of 15 residential units and 2 commercial units (Exhibit C-23). Mr. Gaztambide testified that as part of the appraisal process (which culminated in his appraisal report- Exhibit 29) he visited and inspected the subject property with his associate Mr. Carlos Sosa who is also a licensed professional appraiser. They discussed the conditions of each property. Mr. Sosa selected a number of comparables which we re-discussed. Then, the third step was to prepare the analysis. These three (3) steps occur after the identification of the problem and asserting the relevance of certain facts and market activity. Mr. Gaztambide testified that as part of the appraisal process he reviewed certain documents such as: (i) the legal description of the units; (ii) the field information; (iii) certain documents that Mr. Sosa provided to him to

complete the research; and (iv) documents related to market activity. Mr. Gaztambide stated that he is familiar with the Uniform Standards of Professional Appraisal Practice and that these standards have to do with the constraints by which an appraisal must be judged to ensure that the appraisal is not misleading. He testified that his appraisal (Exhibit 29) complies with the standard rules in view of the assignment, and that there are also some regulations which permit the appraiser to be more specific and avoid inadequately supported conclusions. He concluded that the Interagency Appraisal and Evaluation Guidelines do not impose the discounting analysis to the appraiser for this type of situation. Mr. Gaztambide stated that his client requested him to appraise 15 residential units and 2 commercial units. He used a number of comparables in the subject building and used them to analyze and conclude a value for each individual unit. Subdivision valuation was written for proposed tract development which is usually for residential development (urbanizations). Our subject property is not a proposed condominium, but an existing one in which there are 15 unsold units out of 174 units. Mr. Gaztambide stated that a proposed tract development does not compare with the subject property that was appraised.

Mr. Gaztambide stated that his appraisal report complies with the standards and regulations because the appraiser must abide by the assignment which was to appraise 15 residential units and 2 commercial units. The appraisal report also complies with any assumptions (points of relevance) that need to be taken into account in an appraisal of this nature. Mr. Gaztambide stated that his appraisal complies with the scope of what the client ordered and the same was prepared under the disposition of the appraisal standards and guidelines.

Mr. Gaztambide explained that the residential units were valued by the sales comparison approach and the commercial component was appraised by the income approach. He stated that

the highest and best use of the property is to market and sell them independently because the building has an active market under Puerto Rico's economic reality. He recommends that the properties be marketed independently. He stated that the bulk sale analysis (applying a discount rate) is unacceptable for the owner because it would affect negatively the final realization of those properties to cash. Mr. Gaztambide concluded that the absorption rate for this project is one unit every other month. He stated that there are 4 types of units maybe 5 types. He also stated that the regular units (1400 square feet units) may be sold within a 12 month time frame. However, the large penthouse units will take longer to sell than the typical size units. Mr. Gaztambide stated that the units that take longer than 12 months to sell require a discount for the period exceeding one year.

Mr. Gaztambide discussed the appraisal of unit #1511 (Exhibit 29(a)) to illustrate the appraisal methodology that he used for the 15 residential units. He explained that he used the standard Form 1073 which is for individual condominium unit appraisal report, although there is another form for an individual condominium unit appraisal report in which financing is involved. He testified that the comparable sales that were used for unit #1511 were recent sales that took place in the Metro Plaza condominium. The first comparable sale took place on February 2014 and the other (2) comparable sales occurred on October 2013. The first adjustment is a negative adjustment for a sales incentive in the amount of $15,000 because when these three (3) comparable properties were first sold there was a sales incentive for this amount. The other adjustment is a positive adjustment for $2,000 because the comparable sales were inferior to the subject property (unit #1511) since the subject property was improved. An appliance incentive was not considered because both the comparable sales and the subject did not have an appliance

-35-

incentive. He stated that his final conclusion of value for unit #1511 was $275,000 and this value is consistent with the market.

Next, Mr. Gaztambide discussed the appraisal methodology used for the (2) commercial properties under the income approach. The first factor that must be determined is the market rent for this commercial unit (Ponce de León) which was assigned a market rent of $14 per square foot (7,274.71 sq. ft. area of unit) because it has frontage and exposure to Ponce de León Avenue. The second commercial unit was assigned a market rent of $10 per square foot (6,540.36 sq. ft. area of unit) because it has frontage and exposure to Ribot Street. Mr. Gaztambide explained that for the Ponce de León commercial unit he deducted a 5% vacancy and collection allowance loss. In the case of the Ribot commercial unit which will take longer to lease a 10% vacancy and collection allowance loss was used. In the case of the Ponce de León unit the effective gross income was $96,900 and for the Ribot unit the effective gross income was $58,900. The first three (3) operating expenses which have to be considered are the taxes, insurance and utilities which are paid by the tenant. For the maintenance and reserves expense a unitary amount $.10/per square foot was used because the person that acquires the unit will provide for tenant improvements, thus the owner will be primarily responsible for the structural soundness of the building. Mr. Gaztambide stated that he used 3% of EGI (Effective Gross Income) for commissions and management and for legal, audit and miscellaneous a fixed amount of $3,000 was used. He stated that for the Ponce de León unit based upon a one year of net operating income at a 10% capitalization rate the value was $900,000. In the case of the Ribot unit after subtracting the operating expenses, the first year net operating income was $53,400 and using a 10% discount rate, the value obtained was $534,000 which is considerably less compared to the Ponce de León commercial unit. Mr. Gaztambide testified that in the letter of intent

-36-

(Exhibit D-17) there was an offer for $1,000,000 for the Ponce de León commercial unit which supports his conclusion of value.

Mr. Gaztambide stated that he had seen the document (Exhibit D-5(b)) which detailed the unit prices dated February 10, 2014 after completing the appraisal report. However, Mr. Gaztambide testified that this list price would have no bearing on his opinion because the price that an owner decides he wants for his unit could be a disposition value that is usually below market value. The list prices are suggested prices whereas the comparables in the report are actual closings, comparable sales and thus, have more weight than the list (asking) prices.

Upon cross-examination, Mr. Gaztambide proceeded to read the definition of subdivision from the book titled, Subdivision Valuation and stated as follows: "the definition of subdivision taken from the fourth edition of the dictionary of real estate appraisal can apply to a wide variety of valuation issues. We think of typical suburban subdivisions designed for single unit residential use where individual lots are sold to end users or homebuilders over time. A subdivision methodology can also be used to solve for a wide range of property types including residential subdivisions, office development, condominium projects, industrial parks and other properties in which the individual lots used or pods are sold over time."  Mr. Gaztambide read from his deposition transcript (Exhibit C-28, pg. 54) in which he was asked whether this project fell under the definition of tract development and he answered yes.

Mr. Gaztambide stated that after determining the subject property the Interagency Appraisal and Evaluation Guidelines provide reliable methods for determining market values of properties. He testified that pursuant to his engagement letter he was requested to prepare individual valuations of the market valuation of each residential unit. Mr. Gaztambide testified that he was not retained to determine the best methodology to determine the value of the

-37-

property, meaning the 15 residential units and the 2 commercial units (Exhibit C-23, Engagement Letter). He stated that he was not retained by Mr. Paul Lavergne to determine the market value of the 17 units as one subject property or the value to a single purchaser. Mr. Gaztambide stated that the effective date of his appraisal report was February 11, 2014. He stated that he did not discuss the particularities of this bankruptcy case in preparation for the appraisal report. Mr. Gaztambide stated that his best recollection is that he became aware that the plan proposes to surrender all the property to PRLP after he prepared his appraisal report. However, surrendering of the properties to PRLP does not affect the conclusion regarding the market value of the properties. He proceeded to read the definition of market value from his appraisal report which is as follows: "[t]he most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress" (Exhibit D-29, pg. 15).

Mr. Gaztambide stated that he came to the conclusion that the 15 residential units and commercial units that comprise the subject property are secured by a single loan, but he was never provided with this information. He also stated that he was informed that there was a negotiation not an outright done deal regarding the surrendering of the subject property in satisfaction of the debt. However, he was informed of the surrendering of the subject property along the way. He stated that under the market value definition, the debtor would be the seller and the creditor would be the buyer. Mr. Gaztambide testified that under the scope of work standard it is required to consider case law. In this case, he did not consider any case law for his valuation. He stated that under the assumption of a bulk sale scenario, a discounting process

would be applicable. He did not apply discounts in his appraisal because it was not part of his assignment. Thus, he did not consider marketing expenses, administrative expenses, costs of transferring the subject property to a creditor, entrepreneurial profit, maintenance fees, and insurance expenses. Mr. Gaztambide stated that these discounts are not necessary when one is appraising a single unit. These discounts are applicable when determining market value in a bulk sale to a single purchaser. He stated that he did not factor present value in his appraisal report.

Mr. Gaztambide agreed that by definition a tract development with unsold units is a project with 5 units or more that is constructed or is to be constructed as a single development. The appraisal for these properties under a bulk sale scenario must reflect deductions and discounts for holding costs, marketing costs, entrepreneurial profits supported by market data.

Mr. Gaztambide stated that in his appraisal report he included as an extraordinary assumption that the 15 existing unsold residential units should be delivered in approximately 30 months (1/2 a unit per month) and that the 2 commercial units should be delivered in approximately 18 months as duly supported by market evidence (Exhibit D-29, pg. 18).

Mr. Gaztambide in his appraisal report concluded that the aggregate market value of the fifteen (15) unsold residential units is $5,895,000 and that the aggregate market value for the two (2) commercial units is $1,530,000 for a total value of $7,425,000 as of the effective date of February 11, 2014.

*Mr. Luis Vallejo- Real Estate Appraiser*

Mr. Luis E. Vallejo Romeu, real estate appraiser, MAI (Member of the Appraisal Institute), testified that the bulk sale was the proper valuation methodology required for the present problem at hand. Mr. Vallejo stated that in the 2013 appraisal report his conclusion of value as to the aggregate retail value of the unsold subject units and locales was in the amount of

$9,400,000 and their discounted market value was in the amount of $6,450,000. In addition, at that time the parking garage had not been sold and the conclusion as to the market value of the same was in the amount of $900,000 (Exhibit D-24). The parking garage was later sold with fewer parking units (originally 196 units, sold 160 units). Mr. Vallejo stated that he prepared a second appraisal report in the year 2013 because the master deed was revised and the size of the locales was increased. In addition, the difference in the parking spaces that were actually sold (160 units) and the ones that were going to be sold (196 units) were distributed amongst the two commercial locales. Before, each commercial space was allocated 10 parking spaces per locale. Now, the locale facing Ribot Street has 27 parking spaces and the locale facing Ponce de León Avenue has 29 parking spaces. Mr. Vallejo testified that he prepared the 2014 appraisal report upon Mr. Lavergne's request since he wanted to know the value of the 15 unsold residential units and the 2 commercial locales. He stated that he informed Mr. Lavergne that there was a significant change in value and the latter requested a restricted report. Mr. Vallejo testified that in the 2014 appraisal report his conclusion was $5,700,000 for the sum of the aggregate retail values for the residential component and $1,900,000 for the commercial component for a total of $7,600,000. Under the discounted market value or value to a single purchaser in bulk basis for the overall property the value was $5,300,000 (Exhibit D-25). He stated that when you appraise a property that is comprised by various units, lots, single family dwellings the first and outmost motivation in buying that property is profit, thus the first deduction is a cushion for profit, the second deduction is for carrying costs during the absorption period and the third deduction is to account for the time value of money. The percentages used for the operating expenses were 3.5% for the sales expenses; 2.5% for marketing expenses; 1.5% for miscellaneous and 12% for profit. Mr. Vallejo testified that he reviewed Mr. Bonnin's appraisal report and concluded that in

general terms they both used the same methodology. The differences were that they had concluded different values for the residential units and commercial locales. However, the areas used for the commercial locales were the revised ones and thus, they account for a higher value for these properties. In addition, Mr. Bonnin's appraisal report would have to account for the 36 additional parking spaces in the two (2) commercial locales. If the additional area of locale #1 is accounted for which is 219 square feet at the market value and taking Mr. Bonnin's unitary value of $110 per square foot, the value would increase by $24,090 plus with the 17 additional parkings at $20,000 per parking space the value (as per Mr. Bonnin's unitary value) of locale #1 would increase by $364,090. Locale #2 now has an additional 434 square feet at $146 per square foot (as per Mr. Bonnin's unitary value) the value would increase by $63,364 plus 19 additional parkings at $20,000 per parking space ($380,000 increase in parking space) would increase the value of locale #2 by $443,364. If you add the additional areas plus the additional parking spaces for commercial locales #1 and #2 this would increase the aggregate retail values by $807,454. Mr. Vallejo testified that if one rounds to $800,000 and adds it to Mr. Bonnin's value conclusion of $4,700,000 for the retail sales of the residential units and the $1,700,000 for the 2 commercial locales it would add up to $7,200,000 for the aggregate retail sales of the units.

Mr. Vallejo concluded that if Mr. Bonnin's appraisal report is adjusted to reflect the additional area and parking spaces for the two (2) commercial units the conclusion of value would be higher and in general terms consistent with his conclusion and once you discount that higher figure it is most probable that the discounted value of the property would also be consistent and higher of the value conclusion.

Mr. Vallejo also testified that he prepared a revised document of his previous February document because he realized the Friday before the day of the deposition that there had been an

agreement between the owner and the broker to lower the sales price of the units, thus there was a lower list price for all unsold 15 units. He testified that he recalculated his discounted cash flow to $4,950,000. The aggregate retail value that was recalculated was $7,085,000 based on the revised list prices. Mr. Vallejo stated that Mr. Bonnin's conclusion of value (gross residential value) for the residential component was $4,700,000 and his revised conclusion was $5,185,000 (Exhibit D- 27(b)).

Mr. Vallejo opined that in general terms Mr. Bonnin used the same methodology and the values could be consistent, except for the fact that Mr. Bonnin applied an "arbitrary" adjustment of 25% based on location for the rear unit (commercial unit facing Ribot Street). However, he disagrees with this adjustment because, for example, the front locale was purchased for office use not retail use. He stated that the availability of the amount of retail space on Ponce de León Avenue is visually noticeable and thus, the highest and best use for the commercial locale facing Ponce de León Avenue is for office use not retail use as of the present date. Mr. Vallejo testified that the highest and best use for the entire property is to continue selling the residential units and the 2 commercial locales at the current absorption rate of one (1) per month for the residential units. However, for the commercial units there is a letter of intent to purchase the locale (facing Ponce de León Avenue) for a $1,000,000 which questions the discounting made by Mr. Bonnin on pg. 68 of the appraisal report (Exhibit C-5, pg. 68) because Mr. Bonnin's discounted value for both commercial units is $1,000,000 but it does not make sense if one will receive in the immediate future $1,000,000 for the commercial locale facing the Ponce de León Avenue. Then, this would mean that the locale facing Ribot Street is worthless. He also testified that Mr. Bonnin used the discounted cash flow analysis which is a very usual and valuable accepted technique but this technique is mainly used when markets are strong and stable to provide the benefit to the

-42-

property that it can have rent increments throughout the years, but with the current market limitations one has to estimate a value for the reversion on the first part for six years and then calculate its present worth. Mr. Vallejo stated that given the present market conditions he would have used the direct capitalization rate on the commercial properties which is the method used by Mr. Gaztambide (Exhibit C-5, pg. 74). Mr. Vallejo concluded that Mr. Bonnin's discounted value of the commercial properties in the amount of $1,000,000 should be revised because the number of parking spaces per locale has been increased substantially.

Mr. Vallejo testified that his conclusion of retail value as to commercial property fronting the Ponce de León Avenue was $1,000,000 and as to the commercial locale in Ribot Street his conclusion of value was $900,000. Mr. Bonnin's retail conclusion of value for the commercial property fronting Ponce de León Avenue was $1,000,000 and for the property on Ribot Street his retail conclusion of value was $700,000. He stated that his conclusion of market value of the property is $4,950,000 (Exhibit D-27(b)). His conclusion for the retail value of the commercial units was $1.9 million and then this figure is discounted for certain expenses such as marketing, profit, present value and miscellaneous. He testified that aggregate retail value is not market value but the individual values of a property component. In this case, it is the sum of the individual market values of 15 residential units and 2 commercial locales. Mr. Vallejo agreed that in this case pursuant to the Appraisal Institute, market value is the most probable price for which the 17 units would be sold to a single buyer that is prudent and knowledgeable. Mr. Vallejo explained that his conclusion of market value was altered because 3 or 4 days before the deposition he was provided with a revised price list. He explained that in order to reach the market value conclusion in Exhibit D-27(b) expenses, costs and profit must be discounted. Also, one must take into account the present value of the net income generated by the sales from the

units to end users (money now is worth more than money later). Mr. Vallejo stated that the absorption rate of the project for the last three (3) years has been hovering around 1 unit per month. However, the absorption rate in the year 2012 was 1.2 units; in the year 2011 it was 1.8 units; and in the year 2010 it was 3.3 units. Mr. Vallejo testified that the absorption rate had gone down throughout the years but it is not necessarily because the least attractive units are the ones that are sold at the end. However, this is a factor that could affect absorption rate and it has happened in some projects. He stated that as to the penthouse units the absorption number does not hold true in the recent past but one must factor is that in his revised document he lowered the value of the penthouse units by $48,000 to $50,000 per unit. The retail value of the penthouse unit is now $475,000 per the revised February 2014 list price. During the last fourteen (14) months only one penthouse unit has been sold. Mr. Vallejo explained that the typical market behavior is that when prices are lowered the absorption picks up, thus one can say that my absorption rate number is somewhat conservative in not lowering the absorption rate of one per month. If the absorption rate decreases, then the value of the properties decreases because you have more time into the future to deal with. He stated that of the 15 residential units he appraised, 7 of them are penthouse units. Mr. Vallejo explained that he did not take into consideration the location of the Ribot commercial space properties because he thinks that the highest and best use is for office space since there are certain businesses that do not need exposure. He stated that for retail space a location in Ponce de León Avenue used to be more attractive but now there is no demand for retail space in the area from the Sagrado Corazón station to Miramar. He stated that he also based his conclusion on the fact the front locale is being purchased for office use.

Mr. Vallejo testified that pursuant to the revised document he prepared (Exhibit D-27(b)) under the value to a single purchaser the 12% profit component would equal $850,200. The total holding costs and expenses not including the profit component would equal $531,375. Mr. Vallejo calculated that if the aggregate retail values of the residential and commercial units ($7,085,000) was taken and only the holding costs and expenses were subtracted (excluding the profit component) that would result in $6,553,625 and then this figure would have to be discounted to present value. The difference in the absorption rate from the year 2012 and 2014 is not a significant difference especially when the last numbers were revised and the sales prices of the units were dropped significantly.

Mr. Vallejo testified that in his 2013 appraisal report he included a list of the most recent units that were optioned which included a penthouse unit (unit #2001) that had a sales price of $551,500 and which was later sold (Exhibit D-24). He stated that currently the highest asking price for a penthouse unit is $505,000 which is approximately $45,000 lower. The sales price for the other penthouse units is $475,000. Right now, the sales price for the penthouse units are lower than the selling price for the penthouse unit that was sold.

Mr. Vallejo restated that the market value of the subject property is $4,950,000 and any factor that is taken out of his calculation or methodology would affect the market value opinion. One could eliminate the profit line item but would have to increase the discount rate to incorporate the profit into the discount rate but you would have to consider profit. He stated that the risk of a longer absorption rate and price reduction is a buyer's risk and one always looks at market value from the shoes of the buyer. Mr. Vallejo testified that Mr. Bonnin used a 25% discount rate, profit included and his discount rate was 20% plus the 12% profit to account for the period it would take to sell the property and bring the proceeds to their present worth.

-45-

Mr. Vallejo concluded that the aggregate retail sales value of the residential units is $5,185,000 and that the aggregate retail sales value of the two (2) commercial locales is $1,900,000. He concluded that the market value to a single purchaser (bulk sale) of both the residential and commercial units is $4,950,000 as of the effective date of March 14, 2014. He stated that he did not segregate the total bulk value to a single purchaser into the residential and commercial component.

### *Mr. Rafael Bonnin – Real Estate Appraiser*

Mr. Rafael Ernesto Bonnin Suris testified that he has a bachelor's degree in industrial engineering, is a licensed real estate appraiser and a certified general appraiser. He stated that he is an MAI (member of the appraisal instate) and holds a CRE (Counselors of Real Estate) designation. He stated that he has been appraising for over twenty years.  Mr. Bonnin testified that he was engaged to provide an opinion of market value of the subject property "as is" condition per the current date of the appraisal. The subject property consists of a group of units that remain unsold in a condominium; 15 residential units and 2 commercial locales.  Mr. Bonnin testified that as part of the methodology employed he relied on the information from a 2012 report prepared by Mr. Luis Vallejo for the areas of the units. He stated that due to the adversarial nature of the proceedings, the client requested Mr. Bonnin not to contact the property owner. Mr. Bonnin stated that he did not visit the property for this particular engagement due to the adversarial nature, but that he has visited the property in the past as a real estate appraiser looking for comparable sales.  He stated that he visited the project in the year 2013 because he was interested in purchasing an apartment at that time. He received from the client the last sales that had occurred since his previous appraisal report in the year 2012. He testified that then he

-46-